UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

GARY MCFADDEN,

          Plaintiff,

v.                                   Case No.  5:08-cv-144-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

          Defendant.
_____/

## ORDER

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying his applications for a period of disability, disability insurance benefits, and supplemental security income. (Doc. 1.) The Commissioner has answered (Doc. 9), and both parties have filed briefs outlining their respective positions. (Docs. 12 & 13.) For the reasons discussed below, the Commissioner's decision is due to be **REVERSED and REMANDED**.

## I. PROCEDURAL HISTORY

On April 16, 1997, Plaintiff filed applications for a period of disability, disability insurance benefits, and supplemental security income, alleging a disability onset date of September 10, 1996. (R. 75-78, 218-19.) Plaintiff's applications were denied initially and upon reconsideration. (R. 54-55, 58-59, 62-65, 68-69, 220-27.) Thereafter, Plaintiff timely pursued his administrative remedies available before the Commissioner and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 70.) The ALJ conducted Plaintiff's administrative hearing on October 15, 1998. (R. 33-53.) The ALJ

issued a decision unfavorable to Plaintiff on December 2, 1998. (R. 10-21.) Plaintiff's request for review of the hearing decision by the Social Security Administration's Office of Hearings and Appeals was denied.  (R. 4-6.) Plaintiff then appealed to this Court by filing a Complaint on June 7, 2000.[1] On April 30, 2001, the Court entered an Order remanding the matter to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g). (R. 340-62.) On remand, the Appeals Council vacated the final decision of the Commissioner and remanded the case to an ALJ for further proceedings consistent with the Court's Order. (R. 363-64.) Pursuant to the Appeals Council's Order, a supplemental hearing was held on February 15, 2002 and the ALJ issued a decision partially favorable to Plaintiff on April 1, 2002. (R. 374-86.) On July 28, 2004, the Appeals Council assumed jurisdiction of the matter in response to Plaintiff's request for review of the ALJ's decision and thereafter remanded the case back to an ALJ for further evaluation. (R. 410-13.) A second supplemental hearing was held on February 28, 2005 (R. 459-77) and the ALJ issued his corresponding decision which was partially favorable to Plaintiff on March 31, 2005. (R. 313-24.) Once again, Plaintiff requested review of the decision. After the Appeals Council declined to assume jurisdiction, Plaintiff appealed to this Court. (Doc. 1.)

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial

---

[1] <u>McFadden v. Massanari</u>, No. 5:00-cv-184-Oc-GRJ.

evidence.[2] Substantial evidence is more than a scintilla in that the evidence must do more than merely "create a suspicion of the existence of [a] fact," and must include "such relevant evidence as a reasonable person would accept as adequate to support the conclusion."[3]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[4] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[5] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[6] The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than

---

[2] *See* 42 U.S.C. § 405(g).

[3] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Richardson v. Perales, 402 U.S. 389, 401(1971); Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); *accord* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote, 67 F.3d at 1560; *accord* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding court must scrutinize entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding court must also consider evidence detracting from evidence on which Commissioner relied).

[6] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

twelve months.[7] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[8]

The ALJ must follow five steps in evaluating a claim of disability.[9] First, if a claimant is working at a substantial gainful activity, he is not disabled.[10] Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[11] Third, if a claimant's impairments meet or equal an impairment listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations, he is disabled.[12] Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.[13] Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.[14]

---

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-.1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *See* Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10] 20 C.F.R. § 404.1520(b).

[11] Id. § 404.1520(c).

[12] Id. § 404.1520(d).

[13] Id. § 404.1520(e).

[14] Id. § 404.1520(f).

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[15] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[16] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[17]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[18] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[19]

The ALJ may use the grids as a framework to evaluate vocational factors so long as the ALJ introduces independent evidence of the existence of jobs in the national

---

[15] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[16] Doughty, 245 F.3d at 1278 n.2.
In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.
Id. (internal citations omitted).

[17] Walker, 826 F.2d at 1002. Once the burden shifts to the Commissioner to show that the claimant can perform other work, the grids may come into play. Id.

[18] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[19] Walker, 826 F.2d at 1003.

economy that the claimant can perform.[20] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[21] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[22]

## III. SUMMARY OF THE RECORD EVIDENCE

Plaintiff was forty nine (49) years old at the time of the ALJ's decision on March 31, 2005.[23] He has a fifth or sixth grade education, and has previous work experience as a bakery worker, citrus packer, and lawn maintenance worker. (R. 104, 108, 469.) Plaintiff contends that he has been unable to work since September 10, 1996 due to pain and numbness in his neck, shoulders, back, arms, and legs, and headaches. (R. 76, 87.) Plaintiff is insured for benefits through September 2001. (R. 314.)

In the ALJ's review of the record, including Plaintiff's testimony, medical records from several health care providers, and testimony from Dr. Richard Smith, an impartial medical expert, the ALJ determined that Plaintiff suffers from degenerative disc disease of the cervical and lumber spine with spinal stenosis at C5-C6 and L4-L5 due to congenitally short pedicles, multiple level degenerative changes, status-post remote lumbar spine surgery, chronic cervical strain/sprain, myofascial pain in the trapezius

---

[20] Wolfe v. Chater, 86 F.3d 1072, 1077-78 (11th Cir. 1996).

[21] *See* id.

[22] *See* Doughty v. Apfel, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

[23] (R. 76, 313-26.) On appeal, Plaintiff challenges the ALJ's decision to find Plaintiff's testimony less than fully credible for the time period commencing September 10, 1996 through January 1, 2001 (hereinafter "the relevant time period"). Plaintiff turned forty five years old on January 1, 2001. (R. 76.)

muscles bilaterally, low back pain with radiculopathy, and cervicalgia. While these impairments are severe, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations. (R. 322.)

The ALJ then found that between the date of alleged onset of disability and January 1, 2001, Plaintiff retained the RFC to perform the exertional demands of sedentary work "except for prolonged standing or walking or repetitive lifting of more than ten pounds and overhead reaching." (R. 322.) However, according to the ALJ, beginning on January 1, 2001—the day Plaintiff turned forty five (45) years old—Plaintiff's RFC had significantly eroded such that he has been unable to perform the full range of sedentary work on a sustained basis. After finding that Plaintiff could not perform his past relevant work as a bakery worker, citrus packer, and/or lawn maintenance worker at any time since his alleged onset of disability, the ALJ applied Rule 201.17 of the Medical-Vocational Guidelines (the "grids")[24] as a "framework" and found that, as of January 1, 2001, Plaintiff was disabled. However, with respect to Plaintiff's disability status prior to January 1, 2001, the ALJ concluded that Rule 201.23 of the grids directed a conclusion that he was not disabled. (R. 322-23.)

---

[24] 20 C.F.R. § 404, subpt. P, app. 2.

***Medical Evidence***

Discussion of the evidence of record has been exhaustively covered in this Court's previous Order (R. 349-353), and other than Plaintiff's testimony on February 28, 2005, no additional evidence has been submitted since that time.

In sum, Dr. Dan Boggus was the first medical provider to treat Plaintiff after his work related injury in October 1995. He observed Plaintiff's progress until January 1996 when Plaintiff fully recovered from his injury and was released back to full duty. (R. 145.) Thereafter, Plaintiff experienced an exacerbation of his neck and back problems and returned for treatment in November 1996. (R. 144.)

On November 4, 1996 Plaintiff presented with complaints of neck and right shoulder pain and tingling sensation radiating down his upper arm and occasionally into his fingers. Plaintiff was diagnosed with a mild flare up of cervical radiculopathy and released to work with restricted use of his right arm. (R. 144.)

Four months later, Plaintiff returned with complaints of intermittent, electric-like shooting pains up his neck and pain upon raising his arms over shoulder height. (R. 144). Plaintiff advised that he had full strength in his arms. Examination of his neck revealed no swelling, full range of motion in his arms and neck, and pain produced when he raised his arms over head. Plaintiff's reflexes were intact in his upper extremities bilaterally. Dr. Boggus noted Plainitff had slightly decreased muscle strength in his right arm. Dr. Boggus' assessment was a mild flare up of cervical radiculopathy and he referred Plaintiff to a neurologist. (R. 144).

On March 11, 1997, Plaintiff returned with complaints of a chronic sensation of intermittent pins and needles, fatigue, and weakness in his shoulders and arms, accompanied by low back pain (R. 142). Dr. Boggus noted there were no objective signs of neuropathic lesion or osteoarthritis and diagnosed Plaintiff with intermittent paresthesias of the upper extremities. He restricted Plaintiff to no repetitive lifting and no lifting of more than ten to fifteen pounds. (R. 142.) Plaintiff returned for a follow up visit with complaints of neck and shoulder pain. Examination revealed Plaintiff had normal muscle strength in his upper extremities and a stiff neck. Dr. Boggus opined that "because of pain and stiffness in his neck and shoulders . . . Plaintiff is still unable to do any manual labor, lifting. He can do clerical activities at work if he had the appropriate education and training." (R. 142.)

Plaintiff initiated treatment with Dr. Donald Tindall in June 1997 and he presented with complaints of neck, shoulder, and low back pain that occasionally radiated into his left wrist and right elbow. (R. 163-65.) Dr. Tindall noted that "overall [Plaintiff] feels better." His examination of Plaintiff was normal except for noting some tenderness and trigger points in Plaintiff's trapezius muscles bilaterally and decreased sensation in Plaintiff's left leg. Plaintiff had full range of motion in his cervical spine and shoulders bilaterally. Dr. Tindall did not observe any significant muscle spasms, and noted that sensation was intact in Plaintiff's upper extremities and his motor strength was intact in all extremities. (R. 163-65.) On July 24, 1997, Dr. Tindall released Mr. McFadden to return to work and "continue with present work restrictions." (R. 161.)  On August 18, 1997, although Plaintiff complained that his symptoms had worsened, Dr. Tindall's

neurological examination  was unremarkable and physical examination was unremarkable except for diffuse muscle tenderness in his neck and shoulders. (R. 160.) In September 1997, Plaintiff complained of intermittent numbness in his upper extremities bilaterally and left shoulder which gets worse when Plaintiff moves his neck. Neurological examination was intact and physical examination revealed full range of motion in his neck and left shoulder with diffuse muscle tenderness in his neck and shoulders. Dr. Tindall opined that Plaintiff's neck condition did not require surgery and referred Plaintiff for a second opinion. (R. 158.)

Plaintiff sought treatment from Dr. Matthew Imfeld on September 29, 1997. Plaintiff complained of pain in his neck and upper back with numbness and tingling radiating into his left arm and right shoulder. (R. 208.) Dr. Imfeld's neurological exam of Plaintiff was unremarkable. EMG studies conducted in October 1997 were normal. (203-04.) Dr. Imfeld restricted Plaintiff to lifting no more than ten pounds and no overhead work. (R. 206). Dr. Imfeld treated Plaintiff over the course of two more office visits until he concluded in November 1997 that Plaintiff was at maximum medical improvement with approximately 3% impairment. He opined that there was "nothing further to do." He permanently restricted Plaintiff from overhead work and lifting over 20 pounds. (R. 193).

Dr. Imfeld reevaluted Plaintiff in April 1999 when Plaintiff returned with complaints of neck pain that radiated into his arms – predominantly on the left. He also complained of weakness in his upper extremities. Examination was normal. Dr. Imfeld sent Plaintiff for an MRI. Upon reviewing Plaintiff's MRI results, Dr. Imfeld concluded

that it was unchanged from the previous MRI taken two years prior. He sent Plaintiff for another EMG study which showed nerve root irritation at C5-C6. (R. 298.)

Plaintiff returned a month later complaining that his pain had increased. Dr. Imfeld opined that Plaintiff's symptoms could be due to stenosis as reflected in Plaintiff's MRI. (R. 298.)

In January 1999, Plaintiff underwent an independent medical evaluation by Dr. Richard C. Smith while pursuing his worker's compensation claim. (R. 232-35.) Plaintiff reported complaints of constant neck and low back pain radiating to both legs. Neurological examination was normal. Physical examination was remarkable for tenderness in Plaintiff's paraspinal muscles with no muscle spasms. Examination also revealed decreased motor activity in Plaintiff's legs, and straight leg testing was positive bilaterally. (R. 232-34.)

Dr. Smith reviewed x-rays of Plaintiff's cervical and lumbar spine which revealed a collapse at L4-L5 and L5-S1 with anterior and posterior osteophytes, and decreased height at C5-C6 with some anterior and posterior osteophytes. He also reviewed the results of an MRI of Plaintiff's cervical spine from August 1997 which showed central disc herniation at C5-C6 with cord impingement. Based upon his examination of Plaintiff, review of his medical records and the results of diagnostic testing, Dr. Smith diagnosed Plaintiff with herniated disc of the cervical spine at C5-C6; cervical spondylosis, cervicalgia, cervical radulopathy, low back pain, degenerative disc disease in the lumbar spine, and status post remote lumbar spine surgery. Dr. Smith ordered

Plaintiff to refrain from lifting more than ten pounds and to avoid excessive turning of his neck. (Tr. 234-35.)

On March 9, 1999, Dr. Smith opined that Plaintiff's complaints of having headaches three to four times per week; pain upon looking up or down and from side to side; inability to perform overhead lifting; pain with long driving, using the steering wheel and the gear shift; constant pain and numbness in both arms and hands increasing with use; and low back pain radiating into his lower extremeties – left worse than right were consistent with the medical findings of record. (R. 275).

Plaintiff initiated treatment with Dr. Christopher Wilson in June 2000. Examination revealed left antalgic gait and a diminished ability to walk on his toes on the left side. Dr. Wilson observed tenderness in Plaintiff's trapezius muscles with no trigger points or spasms, diminished strength in his triceps with normal sensation and reflexes. He also observed full range of motion in Plaintiff's shoulders. Dr. Wilson noted diminished strength and sensation in Plaintiff's lower left leg, with decreased achilles reflexes bilaterally. Straight leg raise testing was positive on the left. (R. 370-71.) Dr. Wilson diagnosed Plaintiff with cervical degenerative disc disease with symptoms of nerve root compression and/or irritation. He opined that Plaintiff was at maximum medical improvement with conservative treatment. He recommended work restrictions of no overhead work, climbing, bending, repetitive lifting, or lifting more than twenty pounds. (R. 371).

Myelogram studies of Plaintiff's cervical and lumbar spine were conducted in August 2000. The lumbar myelogram showed significant stenosis at L4-L5 level likely

attributable to congenitally shortened pedicles. (R. 372.) The cervical myelogram showed degenerative changes at C5-C6 and C6-C7 with anterior and posterior osteophytes, mild central canal narrowing, but no stenosis or herniation. (R. 373.) Dr. Wilson's colleague, Dr. Michael Broom, thereafter treated Plaintiff in October 2000 and November 2000 for continued complaints of neck and left shoulder pain with some numbness and tingling. (R. 369). His examinations revealed muscle tenderness but no obvious motor weakness and "no other problems seen." (R. 369.)

Between October 1997 and June 1998, three state agency non-examining physicians reviewed the medical evidence of record for Plaintiff and rendered opinions concerning Plaintiff's physical residual functional capacity. All three found Plaintiff capable of lifting and/or carrying twenty pounds occasionally and ten pounds frequently; standing and/or walking about six hours in an eight hour workday; sitting (with normal breaks) about six hours in an eight hour workday; and unlimited pushing and/or pulling. (R. 166-73, 183-90, 209-16.) Two of the state agency physicians found Plaintiff to have no postural or manipulative limitations. (R. 166-73, 209-16.) Due to alleged discomfort in Plaintiff's low back, one of the state agency physicians limited Plaintiff to stooping and crouching only occasionally. (R. 183-90.)

***Plaintiff's Pain Testimony***

Plaintiff previously testified in October 1998, and then again in February 2002,[25] that he had medical problems with his neck and low back which caused him severe

---

[25] Because the transcript of the February 2002 hearing is not incorporated into the record, information concerning Plaintiff's testimony at that hearing was drawn from the summary included in the ALJ's 2002 decision. (R. 379.)

pain, and muscle spasms in his neck, shoulders, arms, low back, and legs. (R. 42-43, 379.) According to Plaintiff, the pain radiates down his legs and arms—left side worse than right. His neck and low back problems caused intermittent numbness in his upper and lower extremities bilaterally—left side worse than right. (R. 50, 379.) Plaintiff also testified that he experiences headaches "sometimes." (R. 50.)

As a result of his symptoms, Plaintiff testified that he could sit between an hour and three hours, could stand for about an hour, could walk about a mile if he took breaks along the way, and could lift a gallon of milk. (R. 43-44, 379.) Numbness in his arms made it difficult for him to grip things. (R. 46, 379.) Pain and numbness in his legs interfered with his ability to drive an automobile for long periods of time. (R. 51, 124, 379.) Plaintiff testified that his pain makes it difficult to bend, stoop, use his arms for prolonged activities, and sit and/or stand for extended periods of time. (R. 43.) In order to obtain relief from his pain, Plaintiff testified that he received injections, and took pain medications and muscle relaxers in an attempt to relieve the pain. He also used a TENS unit and would spend a substantial portion of his day laying on the floor or on his sofa. However, according to Plaintiff, nothing gave him effective pain relief. (R. 44, 379.)

During the hearing on February 28, 2005, Plaintiff's testimony largely mirrored his previous testimony with respect to his subjective complaints except for his description of what activities he was capable of doing during the relevant time period. (R. 462-68.) As a result of the pain and numbness caused by his medical problems, Plaintiff estimated that, during the relevant time period, he was able to walk the length of a football field before he would have to rest. (R. 467.) He further estimated that he could sit for ten

14

minutes at a time before he would need to move. (R. 467.) Plaintiff testified that prolonged sitting or standing causes him severe pain. (R. 468.) Plaintiff also testified that he was unable to reach or do overhead work. (R. 462-63, 465-66.)

Plaintiff attempted to work on two different occasions between September 1996 and January 2001 but testified that he had to quit because of his pain and muscle spasms. (R. 465.)

In his correspondence with the Social Security Administration between 1997 and 2001, Plaintiff reportedly was capable of caring for himself except that he sometimes had difficulty putting on shoes, dressing himself, shaving, and combing his hair. (R. 115, 123.) According to Plaintiff, using his arms to do things, overhead reaching, bending, and prolonged sitting and/or standing caused him increased pain. (R. 115, 123, 128.) Plaintiff advised that, although pain impacted his activities, he "can still do most things . . . at a slower pace" or with breaks. (R. 128.) He reported having the capacity to do such activities as mowing his lawn, doing yardwork, cooking, and housecleaning. (R. 123-24, 128.)

## IV. DISCUSSION

On appeal, Plaintiff challenges the ALJ's decision to give less than full weight to Plaintiff's pain testimony for the time period encompassing the date of alleged onset of disability through Plaintiff's forty fifth birthday on January 1, 2001. Plaintiff also argues that the ALJ improperly relied upon the Grids at step five of the sequential analysis.

## A. The ALJ Articulated a Specific and Adequate Reason in Support of His Credibility Finding.

Plaintiff testified that, during the relevant time period,[26] his impairments caused severe pain and as a result of that pain, he was unable to reach, do overhead work, and/or sit, stand, or walk for extended periods of time. Plaintiff alleged he needed to lay down for most of the day to get relief from his pain. Plaintiff also claimed he had difficulty holding on to things due to numbness in his hands. Plaintiff argues that the ALJ improperly discredited this testimony without articulating one or more specific and adequate reasons to support his decision.

Pain and other symptoms reasonably attributed to a medically determinable impairment are relevant evidence for the ALJ to consider when determining a claimant's capacity to do work.[27] "A symptom in itself is neither exertional nor non-exertional; rather it is the nature of the functional limitations or restrictions caused by an impairment-related symptom that determines whether the impact of the symptoms is exertional, nonexertional, or both."[28]

In order to establish a disability based on subjective complaints of pain, the claimant must first establish that he has one or more medically determinable

---

[26] The "relevant time period" for purposes of this appeal begins on the date of Plaintiff's alleged onset of disability, September 10, 1996 and ends on January 1, 2001—the date after which the ALJ found Plaintiff's testimony to be "fully credible."

[27] SSR 96-8p.

[28] SSR 96-4p.

impairments that could reasonably be expected to produce the alleged pain.[29] Upon finding that the claimant suffers from such an impairment, the ALJ must then address the claimant's complaints of pain to determine the extent to which it limits the claimant's ability to do work. If an ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so and the reasons must be supported by substantial evidence.[30] A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.[31]

In the instant case, the ALJ considered all of the evidence of record and found that, with respect to Plaintiff's condition prior to January 1, 2001, Plaintiff's testimony of debilitating pain was "less than fully credible." In support of his decision, the ALJ noted that Plaintiff had reached maximum medical improvement and several of Plaintiff's treating physicians found Plaintiff was capable of at least sedentary work. While it is unclear to the Court the relevance of the fact that Plaintiff reached maximum medical improvement to the ALJ's assessment of Plaintiff's credibility, the ALJ's second reason for discounting Plaintiff's testimony bears directly on the issue of whether Plaintiff is capable of performing work related activities.

The ALJ did not reject all of Plaintiff's subjective complaints and alleged functional limitations. In fact, in his assessment of Plaintiff's RFC, the ALJ incorporated many of Plaintiff's alleged limitations including: no prolonged standing or walking, and

---

[29] SSR 96-3p; Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir.1991).

[30] See Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir.1987); Jones v. Dep't of Health & Human Servs., 941 F.2d 1529, 1532 (11th Cir.1991).

[31] Hale, 831 F.2d at 1012; MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

no overhead work. Thus, the ALJ only discredited Plaintiff's testimony to the extent

Plaintiff alleged his pain precluded him from being able to perform the minimal

exertional demands of sedentary work.[32]

In support of his credibility determination, the ALJ relied on the opinions of

Plaintiff's treating physicians who considered Plaintiff's subjective complaints along with

their clinical findings and diagnostic test results and concluded that Plaintiff's pain was

not completely incapacitating. While Plaintiff's treating physicians consistently placed

restrictions on Plaintiff's ability to lift and reach, none of them ever placed any

restrictions on plaintiff's ability to sit, stand, or walk. Nor did they place restrictions on

Plaintiff's ability to use his hands. (R. 142, 144, 161, 192-93, 198, 202-04, 207, 299,

300-01, 371.) In fact, one of Plaintiff's physicians explicitly permitted Plaintiff to engage

in all of these activities in a work setting.[33] The ALJ concluded that these medical

opinions were inconsistent with Plaintiff's complaints of totally incapacitating pain. Thus,

the ALJ decided to give less than full weight to Plaintiff's testimony because it conflicted

with the opinions of his own treating physicians. However, although the ALJ discounted

Plaintiff's testimony he still gave it some weight for the relevant time period as

evidenced by the fact that he limited Plaintiff to lifting no more than ten pounds even

---

[32] "Under the regulations, "sedentary work" represents a significantly restricted range of work. Individuals who are limited to no more than sedentary work by their medical impairments have very serious functional limitations." SSR 96-9p.

[33] On December 1, 1995, Dr. Boggus released Plaintiff to light duty work. Dr. Boggus stated: "[Plaintiff] may not do: repeated stooping/bending, lifting over twenty pounds. [Plaintiff] may : walk, stand, use his hands for non-lifting activity." (R. 151) (emphasis in original). Although this occurred prior to the alleged onset of disability, it is relevant to the extent that it demonstrates that Plaintiff's treating physicians could have, but did not, place these types of restrictions on his ability to work during the relevant time period.

though more than one treating physician concluded that Plaintiff was capable of lifting up to twenty pounds. (R. 193, 198, 207.)

Although it is less clear whether the ALJ relied on additional medical evidence to support his decision, it is worth noting that his summary of the medical evidence also refers to normal clinical findings and diagnostic test results regarding Plaintiff's ability to grip. For example, in March 1997, Dr. Broom noted that despite Plaintiff's complaints of numbness in his arms, there was no evidence of neuropathic lesion. (R. 142.) Subsequent examinations consistently revealed no neurological deficits in Plaintiff's upper extremities (R. 142, 158, 160, 163-65, 203-04, 232-34, 298), and EMG studies conducted in October 1997 were normal. (R. 203-04.) All of this evidence supports the ALJ's credibility determination.

Plaintiff also argues that as a result of finding Plaintiff's pain testimony less than fully credible, the ALJ improperly ignored non-exertional limitations associated with Plaintiff's pain such as his impaired concentration. As the Commissioner correctly points out that the ALJ is not obligated to assume that because Plaintiff alleged pain he suffers from all non-exertional limitations frequently associated with pain. The burden is on Plaintiff to show that his mental impairment significantly limits his ability to perform basic work activities.[34] Thus, even if Plaintiff's pain actually causes concentration problems, Plaintiff failed to meet his burden of proof as to that issue. Indeed, over the course of three administrative hearings, Plaintiff never once complained of having problems with his concentration. As such, this argument lacks merit.

---

[34] 20 C.F.R. § 404.1520(c).

Plaintiff also challenged the ALJ's decision to the extent that the ALJ found Plaintiff "fully credible" beginning on January 1, 2001, but not before. Plaintiff argues that the ALJ's selection of this date does not make any sense given the fact that there is no medical evidence of record regarding Plaintiff's medical condition after November 2000. Nonetheless, as explained above, the ALJ articulated a specific and adequate reason for his credibility determination that is supported by substantial evidence. Although there is no additional medical evidence to demonstrate a deterioration in Plaintiff's medical condition as of January 1, 2001, during his hearing in February 2002, Plaintiff testified that his symptoms had gotten worse over the preceding seven to eight months. (R. 379.) In addition, and as a practical matter, the ALJ applied Rule 201.17 of the grids[35] at step five of the sequential analysis and concluded that Plaintiff was "disabled" as of his forty fifth birthday (on January 1, 2001). Thus, because Plaintiff was found to be disabled the ALJ's determination of Plaintiff's credibility after January 1, 2001 is not an issue on appeal and is, therefore, irrelevant at this juncture.

In sum, the ALJ articulated a specific reason for discounting Plaintiff's credibility and the reason is supported by substantial evidence. As such, the ALJ's decision was "sufficiently specific to make clear . . . the weight the adjudicator gave to the . . . [Plaintiff's] statements and the reasons for that weight."[36]

---

[35] 20 C.F.R. §404 subpt. P, app. 2, R. 201.17 ("Rule: 201.17; Age: Younger individual age 45-49; Education: Illiterate or unable to communicate in English; Previous work experience: Unskilled or none; Decision: Disabled.").

[36] SSR 96-7p.

**B.    The ALJ improperly relied on the grids at step five of the sequential analysis.**

Plaintiff challenges the ALJ's use of the grids at step five of the sequential analysis on three bases. First, Plaintiff argues that the ALJ erred by exclusively relying on the grids because Plaintiff is incapable of performing the full range of sedentary work due to a combination of exertional and non-exertional limitations.[37] Second, Plaintiff argues that the ALJ failed to consider properly the effect of Plaintiff's illiteracy in his direct application of the grids. Lastly, Plaintiff argues that the ALJ's mechanical application of the age criteria was improper.

In opposition, the Commissioner argues that the ALJ properly relied on the grids to direct a finding of "not disabled" because Plaintiff failed to demonstrate that his impairments caused non-exertional limitations that prevented him from performing the sedentary work encompassed by the grids.

At step five of the sequential analysis, the burden of proof shifted to the Commissioner to establish that Plaintiff could perform other work that exists in the national economy.[38] In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a

---

[37] In his brief, Plaintiff presents this argument in two different ways: (1) Plaintiff could not perform the full range of sedentary work due to his pain; and (2) Plaintiff had a combination of exertional and non-exertional limitations. However, both "arguments" essentially say the same thing: the ALJ's exclusive reliance on the grids was inappropriate because he found Plaintiff to have both exertional and non-exertional limitations.

[38] Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).

claimant.[39] This burden may sometimes be met through exclusive reliance on the grids when each variable on the appropriate grid accurately describes the claimant's situation.[40] Where a claimant has one or more non-exertional limitations that significantly limit basic work skills, exclusive reliance on the grids is not appropriate.[41] For the reasons that follow, the ALJ's decision to rely exclusively on the grids at step five of the sequential analysis constitutes reversible error.

The ALJ found Plaintiff capable of performing the exertional demands of sedentary work[42] "except for prolonged standing or walking or repetitive lifting of more than ten pounds and overhead reaching." (R. 322.) An inability to perform activities involving overhead reaching constitutes a non-exertional limitation.[43] Thus, according to the ALJ's own assessment of Plaintiff's RFC, Plaintiff's impairments caused both exertional and non-exertional limitations. Reaching is a basic work activity "required in almost all jobs."[44] As such, significant limitations of reaching may eliminate a large number of occupations a person could otherwise do. "Varying degrees of limitations

---

[39] *See* Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).

[40] *See* Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987).

[41] Walker, 826 F.2d at 1002-03.

[42] The guidelines define sedentary work as follows:
Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.
20 C.F.R. § 404.1567(a).

[43] 20 C.F.R. § 404.1569a(c)(1)(vi).

[44] SSR 85-15. Basic work activities include: "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment, responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting." SSR 85-28.

would have different effects, and the assistance of a [VE] may be needed to determine the effects of the limitations."[45] While it may be that a VE will be able to identify unskilled sedentary jobs, which Plaintiff could perform that do not require any overhead reaching, it was nevertheless improper for the ALJ to exclusively rely upon the grids to direct a finding of not disabled after the ALJ had found that Plaintiff was incapable of overhead reaching (bilaterally).[46] Accordingly, the ALJ committed reversible error by failing to obtain testimony from a vocational expert to address the extent to which Plaintiff's inability to do overhead work would erode the occupational base for unskilled sedentary work.

Because the Court finds that the ALJ's exclusive reliance on the grids was improper, the Court need not reach Plaintiff's remaining arguments regarding any errors the ALJ may have made in his application of the grids.[47]

## V. <u>CONCLUSION</u>

In view of the foregoing, the decision of the Commissioner is **REVERSED** and **REMANDED** under sentence four of 42 U.S.C. § 405(g). Upon remand the Commissioner should: (1) obtain vocational expert testimony and reevaluate whether, given Plaintiff's RFC, age, education, and work experience, there is other work in the national economy existing in significant numbers that Plaintiff could perform prior to January 1, 2001; and (2) conduct such further proceedings as the Commissioner deems

---

[45] SSR 85-15.

[46] 20 C.F.R. § 404.1569a(d).

[47] It is worth noting, however, that the grids adequately account for Plaintiff's illiteracy. 20 C.F.R. pt. 404, subpt. P, app. 2, R. 201.23, 201.17.

appropriate. The Clerk is directed to enter final judgment in favor of Plaintiff consistent with this Order and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on September 28, 2009.

GARY R. JONES
**United States Magistrate Judge**

Copies to:

All Counsel